UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
CASE NO. 8:12 cv-792-T-27MAP



UNITED STATES OF AMERICA, *ex rel.*
JOSEPH McBRIDE,

    Plaintiff/Relator,

v.

WASFI A. MAKAR, M.D., AMERICAN
CANCER TREATMENT CENTERS, INC.,
and WASFI A. MAKAR, M.D., P.A.,

    Defendants.
_____/

FILED UNDER SEAL
PURSUANT TO
31 U.S.C. § 3730(b)(2)

## COMPLAINT FOR DAMAGES AND OTHER RELIEF UNDER THE FALSE CLAIMS ACT (31 U.S.C. § 3730)



## NATURE OF THE CASE

1. For at least the past two years, hundreds, and potentially thousands, of patients who were treated at the Defendants' centers in Brevard County have been subjected to improper, unjustified, medically unnecessary, high-risk, and costly medical procedures that were undertaken to treat cancerous tumors. The Defendants then knowingly submitted false claims to Medicare and other federally-funded health care programs for these improper medical procedures.

2. Relator, Joseph McBride, now brings this action on behalf of the United States, pursuant to the federal False Claims Act, to recover those funds that the Defendants have improperly obtained, and retained, as a result of this fraud.

3. Since at least 2009, Relator witnessed the Medicare fraud during his employment at the Defendants' treatment centers where the principal and management disregarded Medicare regulations and, more importantly, the health and welfare of their patients. Relator's complaints about improper billing and improper procedures fell on deaf ears.

4. Relator complained to the principal and to management that they were billing for procedures that were not being done to the patients and that they could not do because they did not have the required and/or operable equipment to perform the procedures. Relator further complained that, although billed for, proper and necessary reviews by the physician were not being performed. Finally, Relator complained that patients were undergoing excessive, unnecessary, and improper procedures solely for the purpose of billing Medicare. Despite Relator's complaints, Defendants failed to notify either the affected patients or Medicare. And, instead of making the required refunds to Medicare for these false claims, Defendants have concealed the overpayments that resulted from their scheme, and have illegally kept such overpayments for themselves as profit.

1

5. Moreover, instead of making the necessary systemic changes to avoid such pervasive fraud in the future, the Defendants have simply continued to bill Medicare for excessive, unnecessary, and improper radiation therapy procedures and have falsely certified the medical necessity and appropriateness of those claims.

6. The Defendants have also repeatedly and falsely certified that they are in compliance with the regulatory conditions of participation in the Medicare program, when they know that they are not in compliance, thereby knowingly submitting additional false claims to Medicare.

7. Accordingly, the Defendants have repeatedly and systemically violated federal law insofar as they have: (a) submitted claims to Medicare and other government programs for medical procedures which they had reason to know were medically not being performed, were being improperly performed, were unnecessary and excessive, were incompatible with standards of accepted medical practice, and were of no medical value; (b) falsely certified their compliance with the conditions of participation in the Medicare program when they knew that they were not in compliance with such prerequisites; and (c) failed to return to the federal government such payments that they were not entitled to receive and that they knew they were not entitled to retain.

8. The end result of these false claims is the illegal enrichment of the Defendants, and the corresponding misappropriation of millions, and potentially tens of millions, of taxpayer dollars.

9. On behalf of the United States, the Relator seeks to recover these damages as well as civil penalties arising from the false claims that Defendants caused to be submitted to the United States, and from the wrongful retention of overpayments and refunds that are due and payable to the United States.

## JURISDICTION AND VENUE

10. This action is brought under the *qui tam* provisions of the United States False Claims Act, 31 U.S.C. § 3729 *et seq.* ("FCA"). The FCA provides, *inter alia*, that any person who knowingly submits a false or fraudulent claim to the federal government for payment or approval is liable to the federal government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, plus three times the amount of the false claim. 31 U.S.C. § 3729(a).

11. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and pursuant to 31 U.S.C. § 3730(b).

12. This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because many of the acts proscribed by 31 U.S.C. § 3729 that are alleged in this Complaint occurred in this District and because the Defendants can be found, reside, or transact business in this District.

13. Venue lies within the Middle District of Florida pursuant to 31 U.S.C. § 3732(a), because many of the acts proscribed by 31 U.S.C. § 3729 that are alleged in this Complaint occurred in this District and because the Defendants can be found, reside, or transact business in this District. Venue also lies within the Middle District of Florida pursuant 28 U.S.C. §§ 1391(b) and (c).

## THE PARTIES

I. **The Relator**

14. Under the FCA, a person with knowledge of false or fraudulent claims against the Government (a "relator") may bring an action on behalf of the federal government and himself.

3

15. Relator, Joseph McBride, is a citizen and resident of Rockledge, Florida. He was employed as a radiation therapy technologist by American Cancer Treatment Centers, Inc., a Florida corporation, which has been providing radiation treatment to cancer patients in Brevard County for more than eighteen years. American Cancer Treatment Centers, Inc. ("ACTC") currently has two locations: one at 211 Coral Sands Drive, Rockledge, Florida 32955; and 845 Century Drive, Titusville, Florida 32780. A third location is currently under construction in Melbourne, Florida. Mr. McBride performed most of his employment duties at the ACTC in Rockledge, although he occasionally also treated patients at the ACTC in Titusville.

16. Wasfi A. Makar, M.D. is a board certified radiation oncologist. Dr. Makar is a duly-licensed physician practicing in Brevard County, Florida. Dr. Makar is the medical director and President of American Cancer Treatment Centers, Inc. and is also the President of Wasfi A. Makar, M.D., P.A., which has its principal place of business at the ACTC in Rockledge.

17. Defendant, Dr. Makar, was an employee, agent, and/or apparent agent of ACTC and was acting within the course and scope of his employment, agency, and/or apparent agency with ACTC, such that ACTC is vicariously responsible for such acts or omissions.

18. Defendant, Dr. Makar, was an employee, agent, and/or apparent agent of WASFI A. MAKAR, M.D., P.A. and was acting within the course and scope of his employment, agency, and/or apparent agency with WASFI A. MAKAR, M.D., P.A., such that WASFI A. MAKAR, M.D., P.A., is vicariously responsible for such acts or omissions.

19. Defendant, WASFI A. MAKAR, M.D.,P.A., was a joint venturer, agent, and/or apparent agent of ACTC and was acting within the course and scope of its joint venture, agency, and/or apparent agency with ACTC, such that ACTC is vicariously responsible for such acts or omissions.

20. As a radiation therapy technologist, Mr. McBride was responsible to implement and perform on patients the radiation therapy plans prescribed by Dr. Makar. In so doing, Mr. McBride had daily contact with patients, operated the radiation treatment and imaging equipment on a daily basis, and had near-daily contact with Dr. Makar.

21. All allegations in this Complaint are based on evidence obtained directly by the Relator, independently, and through his own labor and efforts. The information and evidence he has obtained or of which he has personal knowledge, and on which these allegations regarding violations of the False Claims Act are based, consist of his personal daily experience while employed at ACTC, conversations with authorized agents and employees of the Defendants, and the practice and/or instructions by Defendants while employed at ACTC.

22. None of the allegations set forth in this Complaint are based on a public disclosure of information in a criminal, civil, or administrative hearing; in a Congressional, administrative, or General Accounting Office report, hearing, audit, or investigation; or from the news media. Rather, they are the independent declarations of the Relator.

23. The Relator is an original source of information within the meaning of the False Claims Act, 31 U.S.C. § 3730(e)(4)(B).

24. Prior to the filing of this Complaint, Relator has voluntarily, through his attorney, made all appropriate disclosures to the federal government, pursuant to 31 U.S.C. § 3730.

25. The Relator has also complied with the statutory obligation to file this Complaint under seal, without service on the Defendants, for at least 60 days, pursuant to 31 U.S.C. § 3730(b)(2).

## II. The Defendants and Their Business

26. American Cancer Treatment Centers, Inc. ("ACTC") is a Florida corporation with its principal place of business located in Rockledge, Florida.

27. ACTC operates two centers and a third center is currently under construction in the Melbourne, Florida area. Both ACTC locations administer radiation treatment to cancer patients under the alleged supervision and treatment of its President and medical director, WASFI A. MAKAR, M.D.

28. Dr. Makar is also the President, employee and/or agent of WASFI A. MAKAR, M.D., P.A. which has its principal place of business at the ACTC in Rockledge. Unless otherwise indicated, WASFI A. MAKAR, M.D., P.A. and ACTC are each sued as the agent and/or employee of the other, acting within the course and scope of said agency and/or employment, with the knowledge and/or consent of said co-Defendant.

## APPLICABLE LAW AND REGULATIONS

### I. The False Claims Act

29. The FCA, as amended, provides in pertinent part that:

> [A]ny person who (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; ... or (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990...plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729(a)(1).

30. The terms "knowing" and "knowingly" in the FCA provision above "mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in

deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A). No proof of specific intent to defraud is required. 31 U.S.C. § 3729(b)(1)(B).

## II. Cost Reporting And Claims Processing Procedures Under The Medicare Program

31. In 1965, Congress enacted the Health Insurance for the Aged and Disabled Act, 42 U.S.C. § 1395 *et seq.*, known as the Medicare Program, as part of Title XVIII of the Social Security Act, to pay for the costs of certain health care services. Entitlement to Medicare is based on age, disability, or affliction with end-stage renal disease. *See* 42 U.S.C. §§ 426, 426-1.

32. Reimbursement for Medicare claims is made by the United States through the Centers for Medicare and Medicaid Services ("CMS"), which is an agency of the Department of Health and Human Services ("HHS") and is directly responsible for the administration of the Medicare Program.

33. CMS contracts with private companies, referred to as "fiscal intermediaries," to administer and pay claims from the Medicare Trust Fund. 42 U.S.C. § 1395(u). In this capacity, the fiscal intermediaries act on behalf of CMS. 42 C.F.R. § 413.64. Under their contracts with CMS, fiscal intermediaries review, approve, and pay Medicare bills, called "claims," received from medical providers. Those claims are paid with federal funds.

34. There are two primary components to the Medicare Program, Part A and Part B. Medicare Part A authorizes payment for institutional care, including hospitals, skilled nursing facilities, and home health care. 42 U.S.C. § 1395c-1395i-5. Medicare Part B is a federally subsidized, voluntary insurance program that covers a percentage of the fee schedule for physician services as well as a variety of medical and other services to treat medical conditions or prevent them. 42 U.S.C. §§ 1395j-1395w-5. The allegations herein involve Part B services billed by the Defendants to Medicare.

35. Under Medicare Part B, physicians, like Dr. Makar, his P.A., and free standing radiation therapy clinics, like ACTC, must enroll with Medicare to be eligible for payment of covered medical services provided to treat patients who are beneficiaries under the Medicare program. The physician and the clinic are authorized to bill Medicare for that treatment. Many physicians and free standing radiation therapy clinics, including the Defendants, derive a substantial portion of their revenue from the Medicare Program.

36. In order to get paid from Medicare, a provider, like the Defendants herein, completes and submits a claim for payment on a designated Health Insurance Claim Form, which, during the relevant time period, was or has been designated CMS 1500. This form contains patient-specific information including the diagnosis and types of services that are assigned or provided to the Medicare patient. The Medicare Program relies upon the accuracy and truthfulness of the CMS 1500 to determine whether and what amounts the provider is owed.

37. To this end, the Health Insurance Claim Form, CMS 1500, contains the following certification by the physician or supplier submitting a claim to Medicare:

> I certify that the services shown on this form were medically indicated and necessary for the health of the patient and were personally furnished by me or were furnished incident to my professional service by my employee under my immediate personal supervision, except as otherwise expressly permitted by Medicare or CHAMPUS regulations.

38. That certification is then followed by the following "Notice:"

> Anyone who misrepresents or falsifies essential information to receive payment from Federal funds requested by this form may upon conviction be subject to fine and imprisonment under applicable Federal laws.

### III. Conditions of Participation and Conditions of Payment

39. To participate in the Medicare Program, a health care provider must also file a provider agreement with the Secretary of HHS. 42 U.S.C. § 1395cc. The provider agreement

requires compliance with certain requirements that the Secretary deems necessary for participating in the Medicare Program and for receiving reimbursement from Medicare.

### A. Medical Necessity and Appropriateness Requirements

40. One such important requirement for participating in the Medicare Program is that claims may be submitted to Medicare only when medical goods and services are shown to be medically necessary. 42 U.S.C. § 1395y(a)(1)(A),(B); 42 U.S.C. § 1320c-5(a).

41. Various claims forms, including but not limited to the Health Insurance Claim Form, require that the provider certify that the medical care or services rendered were medically indicated and necessary and that the provider is in compliance with all applicable Medicare laws and regulations. Medicare claim forms also require that providers certify that the information submitted is correct and supported by appropriate documentation and treatment records. 42 U.S.C. § 1395y(a)(1)(A),(B); 42 U.S.C. § 1320c-5(a).

42. The practice of billing goods or services to Medicare and other federal health care programs that are not medically necessary is known as "overutilization."

### B. Obligation To Refund Overpayments

43. As another condition to participation in the Medicare Program, providers are affirmatively required to disclose to their fiscal intermediaries any inaccuracies of which they become aware in their claims for Medicare reimbursement. 42 C.F.R. §§ 401.601(d)(iii), 411.353(d); 42 C.F.R. Part 405, Subpart C. *See also* 42 C.F.R. §§ 489.40, 489.41. In fact, under 42 U.S.C. § 1320a-7b(a)(3), providers have a clear, statutorily-created duty to disclose any known overpayments to the Medicare carrier, and the failure to do so is a felony. Providers' contracts with CMS carriers or fiscal intermediaries also require providers to refund overpayments. *See, e.g.,* 42 C.F.R. §§ 489.20(f), 489.40-42.

44.     Accordingly, if CMS pays a claim for medical goods or services that were not medically necessary, a refund is due and a debt is created in favor of CMS. In such cases, the overpayment is subject to recoupment. 42 U.S.C. §1395gg. CMS is entitled to collect interest on overpayments. 42 U.S.C. §§ 1395g(d), 1395*l*(j).

### IV.     Other Federally-Funded Health Care Programs

45.     Although false claims to Medicare are the primary FCA violations at issue in this case, the patients who were subjected to the medically unnecessary procedures that are the subject of this action were also, in many instances, beneficiaries of one of three federally-funded health care benefit programs – Medicare, Medicaid, or TRICARE/CHAMPUS. Accordingly, those other two programs are briefly discussed as well.

46.     The Medicaid Program, as enacted under Title XIX of the Social Security Act of 1965, is a system of medical assistance for indigent individuals. CMS administers Medicaid on the federal level, and as with Medicare, physicians and treatment clinics may recover costs and charges arising out of the provision of *appropriate* and *necessary* care to Medicaid beneficiaries.

47.     TRICARE, formerly known as CHAMPUS, is a federal program, established by 10 U.S.C. §§ 1071-1110, that provides health care benefits to eligible beneficiaries, which include, among others, active duty service members, retired service members, and their dependents. Although TRICARE is administered by the Secretary of Defense, the regulatory authority establishing the TRICARE program provides reimbursement to individual health care providers applying the same reimbursement requirements and coding parameters that the Medicare program applies. 10 U.S.C. §§ 1079(h)(1) (individual health care professionals) (citing 42 U.S.C. § 1395, *et seq.*). Like Medicare and Medicaid, TRICARE will pay only for "medically necessary services and supplies required in the diagnosis and treatment of illness or

10

injury." 32 C.F.R. § 199.4(a)(1)(i). And, like the Medicare Program and the Medicaid Program, TRICARE prohibits practices such as submitting claims for services that are not medically necessary, consistently furnishing medical services that do not meet accepted standards of care, and failing to maintain adequate medical records. 32 C.F.R. §§ 199.9(b)(3)-(b)(5).

## APPLICABLE MEDICINE

48. Radiation therapy is a type of cancer treatment that uses beams of intense energy to kill cancer cells. The term "radiation therapy" most often refers to external beam radiation therapy. During this type of radiation, the high-energy beams come from a machine outside of the body that aims the beams at a precise point on the body. Radiation therapy damages cells by destroying the genetic material that controls how cells grow and divide. While both healthy and cancerous cells are damaged by radiation therapy, the goal of radiation therapy is to destroy as few normal, healthy cells as possible.

49. Most of the time, patients who are diagnosed with cancer receive radiation therapy as part of their cancer treatment. Doctors use radiation therapy to treat just about every type of cancer. Radiation therapy is also useful in treating some noncancerous or benign tumors. However, there are side effects of radiation therapy as a result of not only which part of the body is exposed to radiation but, importantly, how much radiation is used.

50. One type of radiation therapy is Intensity Modulated Radiation Therapy (IMRT). IMRT is an advanced mode of high-precision radiotherapy that utilizes computer-controlled linear accelerators to deliver precise radiation doses to a malignant tumor or specific areas within the tumor. IMRT allows for the radiation dose to conform more precisely to the three-dimensional shape of the tumor by modulating—or controlling—the intensity of the radiation beam in multiple small volumes. IMRT also allows higher radiation doses to be focused to regions within the tumor while minimizing the dose to surrounding normal critical structures. In

performing IMRT, the multi-leaf collimator is the part of the equipment that helps contour the radiation beam to the three dimensional shape of the tumor in order to deliver a higher dose of radiation within the tumor and a lower dose to the surrounding healthy tissue. Using the multi-leaf collimator, radiation is delivered with adjusted intensity in order to preserve healthy tissue. Typically, combinations of multiple intensity-modulated fields coming from different beam directions produce a custom tailored radiation dose that maximizes tumor dose while also minimizing the dose to adjacent normal tissues.

51.  During the IMRT treatment, the patient is required to lie still while the linear accelerator delivers multiple beams of adjusted radiation to the tumor from various directions. The intensity of each beam's radiation dose is dynamically varied according to the treatment plan which is prescribed by the radiation oncologist, Dr. Makar, and developed with the physicist and dosemetrist, Simon Makar.

52.  Another form of radiation therapy is Image-Guided Radiation Therapy (IGRT) which involves the use of frequent imaging during a course of radiation therapy to improve the precision and accuracy of the delivery of the treatment. Distinct from IMRT, the machines used in IGRT are equipped with imaging technology so that an image of the tumor may be captured immediately before or while the radiation therapy is being delivered with the patient positioned on the treatment table. Then, using specialized computer software, these images are compared to the images taken during the initial assessment of the patient or simulation in order to make necessary adjustments to the patient's position and/or the radiation beams to more precisely target radiation at the tumor and avoid healthy surrounding tissue.

53.  When performing IGRT, *at the beginning* of each radiation therapy session, the patient is carefully positioned guided by the marks on the skin defining the treatment area. Images are then taken using imaging equipment that is built into the radiation delivery machine

or mounted in the treatment room. The physician then reviews the images and compares them to the images taken during the patient's initial assessment or simulation. As a result of the physician's review and comparison of the images, the patient may be repositioned and additional imaging may be performed. After any necessary adjustments are made to the treatment plan and patient positioning while the patient is on the table, radiation therapy is then delivered.

54. IGRT is indicated in patients with tumors in areas of the body that are prone to movement such as the lungs, prostate gland, the liver, or close to critical organs and tissues. Because it involves more frequent exposure to radiation, IGRT should not be performed unless medically indicated.

55. Both IMRT and IGRT are most costly radiation therapy treatments than conventional radiation therapy. As a result, the overutilization of IMRT and IGRT results in significantly increased costs to the federal government and significantly increased profits for the offending providers.

## SUBSTANTIVE ALLEGATIONS

56. At the commencement of Mr. McBride's employment in August 2008 and for the year that followed, multi-leaf collimator based-IMRT was performed on most patients at both ACTC locations, requiring weekly imaging to verify the treatment of the tumor(s). However, sometime in 2009, Mr. McBride and the other therapists were advised that the ACTC in Titusville was to receive new equipment, a Trilogy unit, capable of performing IGRT. Although the employees began to review new software for the new IGRT-capable equipment, the new equipment was never received or used by Mr. McBride or the other therapists at the ACTC locations.

13

57. Despite not receiving IGRT imaging-equipped equipment, commencing sometime in 2009, Dr. Makar instructed Mr. McBride and the other therapists that they were to image patients on a daily basis and bill daily for IGRT, in addition to daily billing for IMRT, and port films. Dr. Makar further instructed that this was to be done for all patients regardless of the location, size, and/or type of tumor(s). Based on Mr. McBride's review of patient files, there is documentation confirming that this additional imaging and daily billing for IGRT began at least as early as December 2009.

58. In order to perform IGRT without an imaging equipped linear accelerator, the patient must be imaged using imaging equipment in the treatment room while the patient is on the treatment table prior to delivering the radiation therapy. The physician must then review and compare the films to the patient's initial films taken during the initial assessment or simulation and then any necessary adjustments to the position of the patient and/or the radiation beams are made prior to delivery the radiation therapy treatment.

59. Dr. Makar is the only radiation oncologist physician for both ACTC locations. Accordingly, it would be physically impossible for IGRT to be properly performed at both locations simultaneously. Nevertheless, IGRT was and is billed for all patients on a daily basis by all therapists at both locations, along with the billing for the required physician reviews.

60. Additionally, sometime in July 2011 at the ACTC in Rockledge, the multi-leaf collimator on the linear accelerator became inoperable. The multi-leaf collimator is the part of the equipment that helps contour the radiation beam to the three dimensional shape of the tumor in order to deliver a higher dose of radiation within the tumor and a lower dose to the surrounding healthy tissue. Without an operable multi-leaf collimator, Mr. McBride and the other therapists could not deliver radiation therapy with adjusted intensity in order to deliver a higher dose of radiation within the tumor(s) and a lower dose to the surrounding healthy tissue –

which is the purpose of IMRT. As a result, at the ACTC in Rockledge from July 2011 and at least through the end of February 2012 when Mr. McBride left his employment at ACTC, Mr. McBride and the other therapists were unable to perform IMRT on the patients. Again, like with the IGRT, despite the lack of properly equipped equipment to perform the IMRT, Dr. Makar and the management, including Simon Makar, instructed Mr. McBride and the other therapists to continue billing daily for IMRT and IGRT, along with billing daily for port films.

61. Finally, because of the frequency of imaging and the multiple patients being treated, Mr. McBride and the other therapists were unable to always have access to the equipment in order to image the patients at the beginning of the treatment prior to delivery of the radiation therapy. Dr. Makar and management, including Simon Makar, the ACTC physicist and dosemetrist, instructed Mr. McBride and the other therapists that if the imaging could not be accomplished prior to delivery of the radiation therapy treatment, then the therapists should image the patient at the conclusion of the treatment session. This procedure is contrary to what is required and medically indicated in order to properly perform IGRT.

62. Since at least December of 2009, the Defendants submitted claims for all the foregoing goods and services that were allegedly provided to patients of both ACTC locations who are beneficiaries of federally-funded health care programs.

63. ACTC and Dr. Makar manage and control the claims administration process at both ACTC locations.

64. The Relator has personal knowledge, and has reason to know as a result of his position at ACTC, that millions of dollars in claims were submitted to the federal government for procedures that were unnecessary, not performed, and/or performed improperly.

65. At a minimum, each of the Defendants "act[ed] in reckless disregard of the truth or falsity" of the representations about medical necessity that were presented to the federal government.

66. The truthfulness of those certifications was a prerequisite to receipt of payment from the government for these claims.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### VIOLATIONS OF THE FALSE CLAIMS ACT, 31 U.S.C. § 3729(a)(1)(A)

67. The United States re-alleges and incorporates paragraphs 1-66 as if fully set forth herein.

68. This is a claim for treble damages, civil penalties and attorneys' fees, under the Federal False Claims Act, 31 U.S.C. §§ 3729, *et seq.*, as amended.

69. By means of the acts described above, Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the United States. The United States, unaware of the falsity of the claims made, and in reliance on the accuracy thereof, paid for claims that would otherwise not have been allowed.

70. By reason of these payments, the United States has been damaged, and continues to be damaged, in a substantial amount.

### SECOND CAUSE OF ACTION
### VIOLATIONS OF THE FALSE CLAIMS ACT, 31 U.S.C. § 3729(a)(1)(B)

71. The United States re-alleges and incorporates paragraphs 1-66 as if fully set forth herein.

72. This is a claim for treble damages, civil penalties and attorneys' fees, under the Federal False Claims Act, 31 U.S.C. §§ 3729, *et seq.*, as amended.

73. By means of the acts described above, Defendants knowingly made, used, or caused to be made or used, false records or statements in support of and material to a false or fraudulent claim in violation of 31 U.S.C. § 3729(a)(1)(B). The United States, unaware of the falsity of the records and statements, and in reliance on the accuracy thereof, paid for claims that would otherwise not have been allowed.

74. By reason of these payments, the United States has been damaged, and continues to be damaged, in a substantial amount.

### THIRD CAUSE OF ACTION
### VIOLATIONS OF THE FALSE CLAIMS ACT, 31 U.S.C. § 3729(a)(1)(G)

75. The United States re-alleges and incorporates paragraphs 1-66 as if fully set forth herein.

76. This is a claim for treble damages, civil penalties and attorneys' fees, under the Federal False Claims Act, 31 U.S.C. §§ 3729, *et seq.*, as amended.

77. By means of the acts described above, Defendants knowingly made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the government, in violation of 31 U.S.C. § 3729(a)(1)(G).

78. By virtue of the false or fraudulent statements made to the government and the concealment by the defendants, the United States has been damaged, and continues to be damaged, in a substantial amount.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff/Relator prays that upon trial or final hearing the Court grant judgment for Plaintiff/Relator and the United States against the Defendants, as follows:

(a) For civil monetary penalties of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, for each false claim pursuant to 31 U.S.C. § 3729(a);

(b) For three times the amount of damages proved, pursuant to 31 U.S.C. § 3729(a);

(c) For costs of court;

(d) For pre-judgment and post-judgment interest at the rates permitted by law; and

(e) For such other and further relief as may be appropriate and authorized by law.

Plaintiff/Relator further prays that he be awarded an appropriate percentage of the amount recovered by and for the United States as a result of this action, together with statutory expenses, plus reasonable attorneys' fees and costs, in accordance with 31 U.S.C. § 3730(d).

## JURY DEMAND

Plaintiff/Relator demands that this case be tried before a jury.

Dated: April 12, 2012

Respectfully submitted,

By: _____
Tod Aronovitz (FBN 186430)
ta@aronovitzlaw.com
Barbara Perez (FBN 989304)
bp@aronovitzlaw.com
ARONOVITZ LAW
2 S. Biscayne Boulevard
Suite 2630 – One Biscayne Tower
Miami, FL 33131
305-372-2772 Telephone
305-397-1886 Facsimile

Nicole V. McLaren (FBN 11310)
nmclaren@legalbrains.com
THE TICKTIN LAW GROUP, P.A.
1800 Pembrook Commons Drive
Suite 300
Orlando, FL 32810
407-749-0303 Telephone
954-570-6760 Facsimile

*Attorneys for Plaintiff/Relator*